COPY

# CIVIL CASE INFORMATION STATEMENT
## (CIS)



Use for initial Law Division – Civil Part pleadings (not motions) under Rule 4:5-1.

**Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the black bar is not completed or if attorney's signature is not affixed.**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY/PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Jeffrey M. Russo, Esq./John Zaiter, Esq. | ( 908 ) 454-0806 | WARREN |

**FIRM NAME (If applicable)**
Russo Law Offices/Broscious & Fischer, PC

**DOCKET NUMBER (When available)**
L-137-06

**OFFICE ADDRESS**
633 Belvidere Road, Phillipsburg, NJ 08865 (Russo)
PO Box 230, Washington, NJ 07882 (Broscious & Fischer)

**DOCUMENT TYPE**
COMPLAINT

**JURY DEMAND** ☑ YES ☐ NO

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Thomas & Nancy Shappell, et al, Plaintiffs | Shappell, et al v. PPL Corp., et al |

**CASE TYPE NUMBER**
(See reverse side for listing)   156

**IS THIS A PROFESSIONAL MALPRACTICE CASE?** ☐ YES ☑ NO
IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT.

**RELATED CASES PENDING?** ☑ YES ☐ NO

**IF YES, LIST DOCKET NUMBERS**   In the Commonwealth Court of Pennsylvania, Docket #584MD2005

**DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)?** ☐ YES ☑ NO

**NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN**
☐ NONE   ☑ UNKNOWN

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**A. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?** ☐ YES ☑ NO
**IF YES, IS THAT RELATIONSHIP** ☐ EMPLOYER-EMPLOYEE ☐ FRIEND/NEIGHBOR ☐ OTHER (explain) _____
☐ FAMILIAL ☐ BUSINESS

**B. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?** ☐ YES ☐ NO   *Class Action Attorney's Fees*

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

CLASS ACTION

**DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?** ☐ YES ☑ NO
IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION: _____

**WILL AN INTERPRETER BE NEEDED?** ☐ YES ☑ NO
IF YES, FOR WHAT LANGUAGE: _____

**ATTORNEY SIGNATURE**

Revised effective 4/1/05



SIDE 2  

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

---

## CASE TYPES (Choose one and enter number of case type in appropriate space on the reverse side.)

### Track I — 150 days' discovery
| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT |
| 505 | OTHER INSURANCE CLAIM (INCLUDING DECLARATORY JUDGMENT ACTIONS) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (SUMMARY ACTION) |

### Track II — 300 days' discovery
| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 602 | ASSAULT AND BATTERY |
| 603 | AUTO NEGLIGENCE – PERSONAL INJURY |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE – PROPERTY DAMAGE |
| 699 | TORT – OTHER |

### Track III — 450 days' discovery
| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

### Track IV — Active Case Management by Individual Judge / 450 days' discovery
| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

### Mass Tort (Track IV)
| | | | |
|---|---|---|---|
| 240 | REDUX/PHEN-FEN (formerly "DIET DRUG") | 601 | ASBESTOS |
| 248 | CIBA GEIGY | 619 | VIOXX |
| 264 | PPA | | |

999 OTHER (Briefly describe nature of action) _____

_____

**If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."**

Please check off each applicable category:

☐ Verbal Threshold          ☐ Putative Class Action          ☐ Title 59

Revised effective 4/1/05

**RUSSO LAW OFFICES**
633 Belvidere Road
Phillipsburg, NJ 08865
(908)454-0806
Attorneys for Plaintiffs

**BROSCIOUS & FISCHER, PC**
111 West Washington Avenue
PO Box 230
Washington, NJ 07882
(908)689-0992
Attorneys for Plaintiffs

---

THOMAS AND NANCY SHAPPELL;
WILLIAM VOGT; HOWARD AND
LINDA STECKEL, Individually and
trading as MOTOVENTURES MARINE;
ANDREW BURKE; GEORGE AND
CATHY KELCHNER; JOHN AND
BETH FRANCESCHINO; MARY JANE
GRANDE; STEVE AND SALLY
FITTANTE; and ROBERT AND LINDA
CASTAGNA, Individually and trading as
CHESTNUT HILL BED AND
BREAKFAST, on behalf of themselves
and all others similarly situated,

Plaintiffs,

-vs-

PPL CORP.; PPL GENERATION LLC;
PPL MARTINS CREEK, LLC,

Defendants.

: SUPERIOR COURT OF NEW JERSEY
: LAW DIVISION: WARREN COUNTY
:
: DOCKET NO.:
:
: CIVIL ACTION
:
:
:
: **CLASS ACTION COMPLAINT**
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

---

1.       This class action is brought by the individually named Plaintiffs in the State of

New Jersey, including the County of Warren, and the Commonwealth of Pennsylvania, for

themselves and on behalf of all other similarly situated individuals and/or entities with property

and/or business interests in close proximity to the Delaware River whose property interests,

together with their health, safety, welfare, use and quiet enjoyment of their property have been

substantially and deleteriously affected by the fly ash spill.  *(The Class).*

2.      This action is brought as a class action for damages sustained as a direct result of PP&L's catastrophic spill of fly ash and other harmful substances from their PPL Corp. Martin's Creek plant into and around the Delaware River. *(The Spill)*

3.      The unprecedented spill of at least one hundred million (100,000,000) gallons of fly ash and its harmful constituents impacted upon the air, surface water, ground water and, further, damaged property, diminished property interests and business interests, and has deleteriously impacted upon the health, welfare, safety, recreation, and the ecological makeup and well-being of the river and watershed, and effectively altered the quiet enjoyment of the property and recreation of volumes of residents of the Delaware River.

4.      The catastrophic spill, which encompassed an unabated discharge for several days was a direct result of the failure of PPL Martin's Creek Ash Basin #4 and subsequently Basin #1 which blanketed the Delaware River with fly ash so extensive that it created a uniform layer of grayish black material covering the bottom of the river and, further, caused fly ash slurry to flood the acreage in or about the PPL Martin's Creek Plant, extending downstream for at least 40 miles from the point of the spill.

## PARTIES

5.      Plaintiffs, Thomas and Nancy Shappell, are married adult individuals and citizens of the Commonwealth of Pennsylvania, residing at 5449 Depues Road, Bangor, Pennsylvania 18013. The Shappells are the lawful owners of their property, which is situated directly on the Delaware River, approximately one-tenth (1/10) of a mile below the point source of the spill. The Shappells are also the lawful owners of two (2) additional riverfront properties which are

located on the river and adjacent to their home and currently occupied by tenants. Any and all of

the Shappells' water supplies, including drinking water, are derived directly from a well located

on their property and in close proximity to the river. Additionally, the Shappells own a riverfront

dock with a boat and frequently utilize the Delaware River as a source of recreation and

transportation. The Shappells bring this action on behalf of themselves and all others similarly

situated.

6.     Plaintiff, William Vogt, is an adult individual and a citizen of the Commonwealth

of Pennsylvania, residing at 4375 First Terrace, Bangor, Pennsylvania 18013. Mr. Vogt is the

lawful owner of his property, which is situated directly on the Delaware River and approximately

1.75 miles below the point source of the spill. Any and all of Mr. Vogt's water supplies,

including drinking water, are derived directly from a well located on their property and in close

proximity to the river. Mr. Vogt owns a riverfront dock with a boat and frequently utilizes the

Delaware River as a source of recreation and transportation. Mr. Vogt brings this action on

behalf of himself and all others similarly situated.

7.     Plaintiffs, Howard and Linda Steckel, are married, adult individuals and citizens

of the State of New Jersey, residing at 64 Harmony Station Road, Phillipsburg, New Jersey

08865. The Steckels are the lawful owners of their property, which is situated directly on the

Delaware River, approximately 6.5 miles below the point source

of the spill. Any and all of the Steckels' water supplies, including drinking water, are derived

directly from a well located on their property and in close proximity to the river. The Steckels

are also the owners and operators of MotoVentures Marine, which is a business operated on the

Delaware River at the aforementioned address. MotoVentures Marine sells a variety of boats and

3

motors and also offers numerous marine services, including boat service and repair.

Additionally, the Steckels also own several boats and a dock on the river and frequently utilize

the Delaware River as a source of recreation and transportation.  The Steckels bring this action

on behalf of themselves, their business, MotoVentures Marine, and all others similarly situated.

      8.     Plaintiff, Andrew Burke is an adult individual and a citizen of the State of New

Jersey, residing at 52 Harmony Station Road, Phillipsburg, New Jersey 08865.  Mr. Burke is the

lawful owner of his property, which is situated directly on the Delaware River, approximately 6.5

miles below the point source of the spill.  Any and all of Mr. Burke's water supplies, including

drinking water, are derived directly from a well located on their property and in close proximity

to the river.   Mr. Burke owns a boat and dock on the river and frequently utilizes the Delaware

River as a source of recreation and transportation.  Mr. Burke brings this action on behalf of

himself and all others similarly situated.

      9.     Plaintiffs, George and Cathy Kelchner are married, adult individuals and citizens

of the State of New Jersey, residing at 56 Harmony Station Road, Phillipsburg, New Jersey

08865.  Mr. and Mrs. Kelchner are the lawful owners of their property, which is situated directly

on the Delaware River and approximately 6.5 miles below the point source of the spill.  Any and

all of the Kelchners' water supplies, including drinking water, are derived directly from a well

located on their property and in close proximity to the river.  The Kelchners are the owners of a

boat and dock and frequently utilize the Delaware River as a source of recreation and

transportation.  The Kelchners bring this action on behalf of themselves and all others similarly

situated.

      10.    Plaintiffs, John and Beth Franceschino are married, adult individuals and citizens

of the State of New Jersey, residing at 60 Harmony Station Road, Phillipsburg, New Jersey 08865. The Franceschinos are the lawful owners of their property, which is situated directly on the Delaware River and approximately 6.5 miles below the point source of the spill. Any and all of the Franceschinos' water supplies, including drinking water, are derived directly from a well located on their property and in close proximity to the river. The Franceschinos own a boat and dock and frequently utilize the Delaware River as a source of recreation and transportation. The Franceschinos bring this action on behalf of themselves and all others similarly situated.

11.     Plaintiff, Mary Jane Grande, is an adult individual and a citizen of the State of New Jersey, residing at 52 Harmony Station Road, Phillipsburg, New Jersey 08865. Ms. Grande's residence is situated directly on the Delaware River and approximately 6.5 miles below the point source of the spill. Any and all of Ms. Grande's water supplies, including drinking water, are derived directly from a well located on their property and in close proximity to the river. Ms. Grande frequently utilizes the Delaware River for recreation and transportation. Ms. Grande brings this action on behalf of herself and all others similarly situated.

12.     Plaintiffs, Steve and Sally Fittante, are married adult individuals and citizens of the State of New Jersey, residing at 556 River Road, Phillipsburg, New Jersey 08865. Mr. and Mrs. Fittante are the lawful owners of their property which is situated directly on the Delaware River and approximately 14.5 miles below the point source of the spill. Any and all of the Fittantes' water supplies, including drinking water, are derived directly from a well located on their property and in close proximity to the river. The Fittantes are the owners of a boat and dock and frequently utilize the Delaware River as a source of recreation and transportation. The Fittantes bring this action on behalf of themselves and all others similarly situated.

5

13.     Plaintiffs, Robert and Linda Castagna, are married, adult individuals and citizens of the State of New Jersey, residing at 63 Church Street, Milford, New Jersey 08848. Mr. and Mrs. Castagna, are the lawful owners of their property which is situated directly on the Delaware River and approximately 26 miles below the point source of the spill. Mr. and Mrs. Castagna are also the owners and operators of the Chestnut Hill Bed and Breakfast, which occupies their residence at 63 Church Street, Milford, New Jersey 08848, and also encompasses another river front property with the address of 71 Spring Garden Street, Milford, New Jersey 08848. The Chestnut Hill Bed and Breakfast is a popular riverfront destination and the guests are offered a variety of amenities, including access directly to the Delaware River via a large waterfront patio and dock. The Castagnas and their guests utilized the river as a source of recreation and numerous water activities including, but not limited to, boating, fishing, swimming, etc. The Castagnas and their business are directly dependent upon access and utilization of the Delaware River. The Castagnas bring this action on behalf of themselves, their business, Chestnut Hill Bed and Breakfast, and all others similarly situated.

14.     The Defendant, PPL Corporation is a Fortune 500 local energy holding company with ownership of various subsidiary corporations including Defendants, PPL Generation, LLC, and PPL Martin's Creek, LLC, with headquarters located in the City of Allentown, Commonwealth of Pennsylvania.

15.     Defendant, PPL Generation, LLC, is a Delaware Limited Liability Corporation registered to conduct business in the commonwealth of Pennsylvania, with a registered business address of 2 North 9th Street, Allentown, Pennsylvania 18101. PPL Generation is the parent company of PPL Martins Creek and is responsible for the operation of approximately 40 power

plants in northeastern, northwestern, and southwestern portions of the United States, including the Martin's Creek plant, controlling more than 12,000 megawatts of power in the United States.

16.     Defendant, PPL Martins Creek, LLC, is a Delaware Limited Liability Corporation registered to conduct business in the Commonwealth of Pennsylvania, with a registered business address of 2 North 9th Street, Allentown, Pennsylvania 18101.  PPL Martins Creek is a wholly owned subsidiary of PPL Generation and it owns and operates the Martins Creek plant which is the point source of the spill.

## FACTUAL AND PROCEDURAL BACKGROUND

17.     PPL Corp. owns and operates a power generation plant located at 6605 Foul Rift Road in Bangor, Pennsylvania.  This facility is commonly known as PPL Martin's Creek LLC or PPL Lower Mt. Bethel (*the plant*).

18.     PPL's plant is massive in scale and situated directly on the Delaware River in Lower Mt. Bethel Township, Northampton County, Pennsylvania.

19.     There are numerous residences located in close proximity to the plant in both Pennsylvania and New Jersey.  PPL also owns several cottages occupied by tenants and located directly under and around the plant, and also across the river in White Township, New Jersey.

20.     The plant is capable of producing electricity via combustion of either coal, oil, or natural gas.  The total maximum output of the plant is approximately 1970 megawatts.

21.     The within action involves a catastrophic failure with respect to PPL's coal combustion facility at the plant.

22.     Coal combustion is the most profitable form of power generation for PPL, however, it is also the most pollutant and detrimental to the environment and public health.

7

23.     PPL powered generation via coal combustion had been in operation for numerous years prior to the date of the spill and has produced significant, excessive, deleterious and harmful toxins in the air, including sulfur dioxide, carbon dioxide, etc., which toxins have subjected individuals in the Commonwealth of Pennsylvania and in the State of New Jersey to substantial illness and disease, including pulmonary, respiratory illness and dysfunctions, and the enhanced risk of contracting said serious illness and disease from the excessive toxin and harmful emissions.

24.     PPL's emissions of carbon dioxins have been so extensive as to cause the New Jersey Department of Environmental Protection to classify and designate the area across the river from the plant in or about Warren County, New Jersey, as a non-attainment area.

25.     As a result of the settlement of the lawsuit filed against the Defendant, PPL, by the New Jersey Department of Environmental Protection regarding excessive levels of toxins from coal combustion, a Consent Order resolving the lawsuit was effectuated requiring PPL to remove and take their coal-burning unit off-line at the plant in September of 2007.

26.     The Consent Decree was effectuated by NJDEP Commissioner, Bradley Campbell as a result of the large quantities of pollutants produced by the coal fired units at the plant. Quantities of air pollutants have historically been and are presently being carried over the river into New Jersey, which negatively impact the air quality in Warren County, New Jersey, as well as portions of Pennsylvania.

27.     In or about July 5, 1991, and continuing to in or about July 22, 2004, the Defendant, PPL, via self-report to Martins Creek, had numerous pollution incidents, including but not limited to discharge/leakage of thousands of gallons of oil, discharge of raw sewage,

8

discharge of waste water, spillage of bottom ash and fly ash, spillage of ethylene glycol, etc., which spillage and discharges impacted upon the surrounding surface and ground water and, further, had infiltrated and impacted the adjacent properties, surface area, ground water, surface water, and the Delaware River.

28.     The spill in the instant matter caused and will continue to cause the release of extensive amounts of harmful substances, including sulfur dioxide, carbon dioxide, etc., into the air which superimposed upon conditions and quality of the air caused by the coal combustion for numerous years has impacted and will continue to deleteriously impact upon the individuals in the State of New Jersey and Commonwealth of Pennsylvania and greatly enhance the risk of said residents from contracting substantial diseases and illnesses.

29.     Fly ash from the coal combustion at the PPL plant contains numerous harmful substances including, but not limited to, arsenic, mercury, lead, silica, crystalline, barium, chromium, beryllium, thallium, antimony, selenium, and other heavy metals and hazardous constituents which has deleteriously affected and will in the future continue to deleteriously affect, via contamination of the ground and surface water, together with the health and welfare of the case and property owners of the State of New Jersey and Commonwealth of Pennsylvania and, further, has affected and will continue to affect the ecology of the Delaware River Shed.

30.     PPL has been authorized by permit from the Commonwealth of Pennsylvania DEP to obtain and utilize one active impoundment fly ash deposit, commonly known as Basin # 4, with several other retired impoundments, located at or near the plant, which retired impoundments, subsequent to the retirement, were not permitted to receive any other further solid waste.

9

31.     Basin #4 is a large impoundment and spans approximately forty (40) acres. It is located on PPL's property, west of the plant and approximately one-quarter (1/4) mile from the Delaware River. Basin # 4 is a permanent solid waste impoundment, and disposed fly ash is never removed from the basin, but rather, land-filled and deposited permanently.

32.     PPL has designed and utilized a series of wooden stop logs to control the flow of "clear" water from the top of the basin for regulated disposal into the river. The "clear" water is released from basin #4 into the river on a controlled basis as per a permit issued by the Pennsylvania Department of Environmental Protection.

33.     PPL had placed Basin #4 into operation in or about 1989, and since in or about 1989, PPL has never inspected or replaced any of the wooden stop logs that provide the only means of controlling the basin's level and discharge into the river.

34.     On or about August 23, 2005, one of the wooden stop logs failed and this failure directly caused an uncontrollable and catastrophic release of fly ash "slurry", as previously specified, directly into and around the Delaware River. The slurry was released via the basin's discharge pipe in massive quantities and with great force, causing manhole covers in the pipeline to blow out.

35.     On or about August 23, 2005, and continuing for several days, Basin #4 from the PPL plant discharged massive quantities of fly ash slurry directly into the Delaware River and was so voluminous that it flooded the acreage including local public roads surrounding Basin #4.

36.     The spill from PPL Basin #4 discharged unabated for several days and continued to rapidly pour directly into and around the Delaware River with the Defendant failing to adequately stop the leak until on or about August 27, 2005.

37.     On or about August 27, 2005, by self-report of the Defendant, PPL, at least 100,000,000 gallons of fly ash slurry was permitted to be discharged and directly invade the waters of the Delaware River and spilling onto the surrounding acreage, including countless properties below the point source of the spill.

38.     The massive spill was representative of Defendants' egregious violation of numerous PA D.E.P. permits including but not limited to:

(a)     Residual Waste Class II Disposal Impoundment Permit No. 301257 issued on January 5, 1999, and reissued on October 30, 2000, for the operation of Ash Basin No. 4.

(b)     Dam Safety Permit No. D48-149 on March 31, 1988 for construction, operation and maintenance of the dam.

(c)     Water Quality Part II Permit No. 4887204 on March 31, 1988, and modified on June 21, 1990, which authorizes construction and operation of Ash Basin No. 4.

(d)     NPDES Permit No. PA0012823 renewed on September 4, 2001, which authorizes the discharge of treated wastewater to the Delaware River.

39.     The discharge of at least 100,000,000 gallons of the fly ash slurry into the river was so severe that it caused a visibly marked change in the composition of the river water from the point source of the spill and continuing for numerous miles downriver with the river's natural appearance becoming suddenly and strikingly altered.  The enormous quantities of the slurry caused the entire river, from bank to bank, to change from its naturally clear flow into grayish-opaque waste water.

40.     The river flow remained visibly gray and opaque for at least 40 miles below the point source of the spill during and for numerous days after the five-day spill event.

41.     Following the spill, the fly ash gradually settled to the bottom of the riverbed and

11

onto and around residential properties at and at a minimum of approximately 40 miles below the spill, directly impacting upon thousands of individuals and entities.

42.     Subsequent to the spill, the fly ash slurry discharge from PPL Basin #4 caused enormous quantities of fly ash to blanket the entire river bottom, from bank to bank, for a minimum of approximately 40 miles below the spill with the fly ash creating a uniform layer of grayish-black material which covered the entire bottom of the river, including the land and property of adjoining riverfront owners.

43.     During the course of the spill, the Defendant and several state and local agencies took numerous water samples from the Delaware River which testing results revealed exceedingly high levels of various harmful and dangerous substances.

44.     In or about August 26, 2005, arsenic levels in the Delaware River, at or about the outfall of the spill, were measured at 592 ppb (the safe drinking water standard is 10 ppb nationally and 5 ppb in the State of New Jersey).  Additional high and unsafe readings of other hazardous substances include mercury at 1.32 ug/l, barium at 503 ug/l, selenium at 37.7 ug/l, lead at 22.2 ug/l, and various other toxins.

45.     During the course of the spill, the Easton Water Authority for forced to take emergency actions due to the infiltration of hazardous substances in the drinking water utilized by the residents of the City of East and adjacent communities.

46.     The Easton Water Intake, which is located approximately 10 miles downstream from the point source of the spill, was forced to shut down for several days due to the infiltration of said hazardous substances from the fly ash slurry discharge from Basin #4 of the PPL plant, and the City of Easton and adjacent communities were forced to implement emergency water

restrictions.

47.     The fly ash discharge from Basin #4 of the PPL plant, with its harmful constituents, visibly blanketed the entire river bottom for at least 7 weeks.  Fly ash measured at the river bottom from the point of the spill to two miles downstream measured from 2 inches to 18 inches deep and, further, the fly ash remained visibly evident at all points and in all areas from the point of the source of the spill to at least approximately 40 miles downstream.

48.     In or about August 23, 2005, and until approximately 7 weeks following the spill, the river levels and river flows remained extremely low and constant, due to a lack of rain, which should have afforded PPL to effectuate reasonable, necessary, and appropriate emergency measures in order to collect fly ash from the bottom of the river, at the point source and beyond the point source of the spill.

49.     Subsequent to the catastrophic discharge, the low water conditions continued for approximately 7 weeks following the spill made reclamation efforts possible, however, the Defendant did not take advantage of this opportunity to perform intensive reclamation on an expedited basis and the heavy rains and high water levels in October and November caused significant disruptions to the settled fly ash on the riverbed, causing a large majority of the 100,000,000 gallons of fly ash slurry to once again move swiftly down the river and spread into areas which had been previously unaffected.

50.     The rising of the water levels and current of the Delaware River caused the fly ash to once again became highly evident on the surface and throughout the water column, and the elevated water levels and increased flow carried large quantities of fly ash up onto riverbanks and forced the fly ash to migrate downstream and further invade and contaminate the Plaintiffs'

13

properties.

51.     Subsequent to the initial discharge, the high water levels of the Delaware River made any further reclamation efforts by PPL virtually impossible due to the widespread distribution of the fly ash and substantial commingling with river's natural ecological materials. Said reclamations efforts were futile and substantially ineffective due to irreparable nature of the spill following the high water levels.

52.     During the course of the spill, PPL failed to cease any and all further coal burning power generation but rather chose to continue producing additional fly ash despite the catastrophic failure of Basin #4.

53.     In or about August 23 to August 27, 2005, during the continuation of the catastrophic spill from Basin #4 into the Delaware River, PPL knowingly and intentionally continued to utilize coal combustion and illegally diverted the newly created fly ash into an unlined, unpermitted, retired basin, commonly known as Basin #1.

54.     PPL's decision to divert newly created fly ash into Basin #1, rather than ceasing any further coal-burning operations, was done intentionally and/or with reckless disregard, exposing the Plaintiffs and similarly situated residents to an unreasonable risk of danger since PPL had specific knowledge that any newly added contaminants to unlined Basin #1 would further infiltrate and contaminate the surface water and ground water and, in addition, the decision to utilize Basin #1 and continue coal-burning operations was based upon economic gain to the detriment of the health, safety, welfare, and property interests of the Plaintiffs and similarly situated entities.

55.     PPL's Basin #1 is a dated and retired disposal basin that had been permanently

14

closed and was not the subject of a permit to receive any further solids and/or hazardous waste, including fly ash residue, by the Commonwealth of Pennsylvania Department of Environmental Protection.

56.     In addition to the unpermitted, unauthorized Basin #1 for depositing newly created fly ash, PPL was also improperly utilizing Basin #1 as a disposal site for the reclamation efforts in and around the spill area.

57.     Despite an outpouring of public concern and protest over the use of the unlined, unpermitted Basin #1, PPL continued to utilize said basin and ultimately obtained retroactive approval to utilize Basin #1 on a temporary basis from the PA D.E.P.

58.     On or about September 8, 2005, Basin #1 also failed and began leaking in and around the area surrounding the basin.  Subsequent to the detection of the leak and failure of Basin #1, PPL was forced to finally shutdown its coal-burning operations until such time as an appropriate and adequate site was available for continued fly ash disposal.

59.     The leak in Basin #1 resulted in contaminants, pollutants, and hazardous substances directly infiltrating the ground and drinking water.  This was evidenced by several elevated readings from monitoring wells in the vicinity of Basin #1, which revealed levels of selenium in the ranges of 70 to 75 ppb (the national drinking water standard is 50 ppb).

60.     During the course of the spill, PPL failed to properly and adequately notify either federal, state, or local officials in a timely fashion.  The delays in notification and the initial reporting of the spill to the PA D.E.P. were delayed and reported in such a fashion as to conceal the nature and extent of the spill.

61.     PPL also failed to adequately and properly notify and warn area residents and

15

property owners downstream of the spill of the dangerous conditions, including air, ground water, and surface water contamination. Further, PPL failed to notify recreational users of the river about the impending danger. The failure to adequately and properly provide warnings by PPL resulted in numerous individuals swimming, boating, jet skiing, etc., in the river during the spill and causing these individuals to unwittingly come into direct contact with fly ash and its harmful and hazardous constituents and substances.

62.     Following the spill, any and all recreational activity in the river, for at least 40 miles below the point source of the spill, had effectively ceased. The heavy quantities of fly ash in the waters prevented the countless property owners and recreational users of the river from entering the river as a source of recreation and/or transportation from the time of the spill and continuing to the present date.

63.     The initial spill, together with any and all post-spill activities of the Defendant has caused overwhelming damage and destruction to numerous property owners including surface and ground water infiltration and contamination, impacted upon recreational users of the Delaware River, and has further affected and placed at great risk the ecological makeup of the Delaware River Watershed.

64.     The spill has left the Plaintiffs' properties, and similarly situated residential and business properties affected by the spill, in a severely contaminated and polluted state, polluting well water, including surface water and well water and, further, affecting prospective well water contamination into the ground water over time as the harmful substances and pollutants continue to infiltrate the surface and ground water due to the nature and extent of the massive spill.

65.     The devastation caused by the failure of Basin #4, PPL's subsequent continuation

16

of coal combustion and the unauthorized utilization of Basin #1, subjects PPL not only to the within citizen class action lawsuit for common law damages, but is representative of violation of the various permits issued by the Commonwealth of Pennsylvania Department of Environmental Protection, together with environmental statutory laws of the State of New Jersey, Commonwealth of Pennsylvania, and the United States, which is the subject of a lawsuit for reclamation filed by the Pennsylvania Department of Environmental Protection and the Commonwealth of Pennsylvania.

66.     The Commonwealth Court of Pennsylvania, via Order dated February 24, 2006, has granted the Petition of specified individuals in the within lawsuit the right of intervention in said reclamation lawsuit, together with the Delaware Riverside Conservancy, a non profit Corporation, with extensive membership in the State of New Jersey and Commonwealth of Pennsylvania.

## CLASS DEFINITION

67.     The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 66 above as though set forth fully herein.

68.     The Plaintiffs bring this action on behalf of themselves and similarly situated plaintiffs, including the class of plaintiffs more specifically defined as follows:

All persons with property and/or business ownership interests in or about the riverfront and/or adjoining properties in close proximity to the Delaware River at the point source of the spill and continuing below/south of the point source for approximately forty (40) miles; the class includes property and business interests from both the Commonwealth of Pennsylvania and the State of New Jersey.  The nature of the property interests includes but is not

17

limited to, ownership interests, tenancy/leasehold interests and business interests. This class of plaintiffs' with property and business locations in or about the Delaware River has also been, further, substantially impacted in regard to issues affecting their diminishment of property values including surface and ground water contamination, use and quiet enjoyment of their property, together with their health, safety, and welfare.

## CLASS ACTION ALLEGATIONS

69.     The plaintiffs incorporate by reference the allegations of paragraphs 1 through 68 above as though set forth fully herein.

70.     The class is so numerous that joinder of all of its members is impracticable. While the exact number of class members is not known at the present time, the riverfront areas at and continuing to a minimum of approximately forty (40) miles below/south of the spill, are comprised of thousands of riverfront communities and property owners on both sides of the river. Additionally, the area encompassed within the class is densely populated and heavily utilized for property interests together with recreation and transportation.

71.     There are various questions of law and fact common to the class, including but not limited to:

> (a)     whether defendant failed to properly and adequately maintain the wooden stoplogs and other integral structures in Basin #4;
>
> (b)     whether defendant failed to inspect and/or reasonably replace the wooden stop logs in Basin #4;
>
> (c)     whether the defendant had adequate and proper maintenance and/or inspection procedures and protocols in place at the time of the spill;
>
> (d)     whether the defendant was negligent, reckless, and/or careless in the acts and/or omissions surrounding the spill;

18

(e)     whether the defendant intentionally and/or recklessly caused the spill;

(f)     whether the defendant recklessly/intentionally or was grossly negligent in unreasonably exposing residents to a known danger and an unreasonable risk of harm;

(g)     whether the continuation of coal combustion operation subsequent to the leak and, further, the transfer to the utilization as a fly ash depository of an unauthorized and unpermitted basin, specified as Basin #1, by the Defendant was intentionally/recklessly/grossly negligently caused and subjected the residents to an unreasonable risk of danger to their property rights, health, welfare, and safety

(h)     whether the defendant violated PA Residual Waste Class II Disposal Impoundment Permit No. 301257; PA Dam Safety Permit No. D48-149; PA Water Quality Part II Permit No. 4887204; NPDES Permit No. PA0012823;

(i)     whether the defendant violated numerous environmental statutes and regulations of the Commonwealth of Pennsylvania, State of New Jersey, and U.S. Federal Government Environmental Statutes;

(j)     whether the defendant intentionally and/or recklessly failed to abate the spill in a timely fashion;

(k)     whether the defendant was negligent, reckless, and/or careless in the handling and storage of solid and hazardous waste;

(l)     whether the defendant failed to utilize due diligence and reasonable care in the generation, use, handling, storage, treatment, transportation, and disposal of solid and hazardous wastes;

(m)    whether the defendant failed to properly and adequately abate the leak in Basin #4 in a timely fashion;

(n)     whether the defendant took proper and adequate measures to prevent the spill from invading the Delaware River together with surrounding and adjacent surface areas and ground water of adjacent properties;

(o)     whether the defendant failed to notify Federal, State and local officials in a timely fashion;

(p)     whether the defendant failed to adequately and reasonably notify and warn area residents in close proximity and downstream of the spill in a timely fashion;

19

    (q)      whether the defendant failed to notify resident business owners and recreational users of the Delaware River in a timely manner;

    (r)      whether the defendant failed to institute and maintain appropriate spill/leak/catastrophe emergency plans.

72.    The aforementioned questions of law and/or fact are common and identical to each class member and predominate over any question affecting only individual class members.

73.    The claims of the class representatives are typical of the claims of the class in that all class members have been adversely affected by the acts and/or omissions of the defendant with respect to the spill and subsequent remediation efforts. Any and all of the claims are uniform as they all directly relate to the facts and circumstances surrounding the spill.

74.    Plaintiffs assure the fair and adequate representation of the class and have no conflicts with class members in the maintenance of this class action. Plaintiffs' claims are not only typical but also identical to the claims of the class. They are aware that they cannot settle this action without court approval and they will vigorously pursue the claims of the class.

75.    Plaintiffs have retained competent counsel, experienced in complex litigation and environmental/solid/hazardous waste litigation. Plaintiffs' counsel has also been intimately involved in various aspects of the within matter since approximately the date of the spill continuing to the present date. Plaintiffs' counsel, on behalf of various Plaintiffs, had filed a Notice of Intention to file a reclamation lawsuit against the Defendants on or about September 20, 2005, citing extensive violations of various permits issued by the Pennsylvania Department of Environmental Protection, together with violations of various federal and state environmental statutes. Plaintiffs' counsel had filed a Petition for Intervention, on behalf of various Plaintiffs,

20

in the reclamation action filed by Commonwealth of Pennsylvania Department of Environmental

Protection, titled *Commonwealth of Pennsylvania Department of Environmental Protection v.*

*PPL Generation, LLC and PPL Martins Creek LLC*, *Docket No. 584 MD 2005*.  The Petition for

Intervention filed by the undersigned counsel was granted with regard to specific Plaintiffs

involved in the within matter, together with the Delaware Riverside Conservancy Inc., a non-

profit corporation.

76.     A class action provides the only fair and efficient method of adjudicating this

controversy.  The substantive claims of the plaintiffs in the class are identical and will require

evidentiary proof of the same kind and application of the same law.

77.     The within Class Action also involves complex environmental issues involving

solid and hazardous wastes and environment impact assessment including ecological, biological,

and health evaluations.  The nature and scope of the within matter, together with the extensive

numbers of members of the class, renders individual adjudication as impractical and highly

prejudicial to the individual claimants.

78.     Notice may be provided to the class by a combination of published notice and first

class mail.

## CAUSES OF ACTION

### COUNT ONE

### NEGLIGENCE

79.     The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 78

above as though set forth fully herein.

80.     The catastrophic spill of at least one hundred million (100,000,000) gallons of fly

21

ash slurry and hazardous substances directly into and around the Delaware River was directly and proximately caused solely by the negligence of the Defendant, their servants, agents and/or employees.

      81.    The negligence of the Defendant, their servants, agents and/or employees, includes, but is not limited to the following:

     (a)    failure to reasonably and properly design a basin which would adequately support fly ash and prevent discharge into and around the Delaware River.

     (b)    failure to properly and adequately maintain the wooden stoplogs and other integral structures in basin #4;

     (c)    failure to properly and adequately inspect the wooden stoplogs and other structures in basin #4;

     (d)    failure to properly and adequately replace damaged and/or aging wooden stoplogs in basin #4;

     (e)    failure to implement and maintain adequate inspection and maintenance procedures and protocols for basin #4;

     (f)    negligent handling and storage of solid and hazardous wastes;

     (g)    failure to utilize due diligence and reasonable care in the generation, use, handling, storage, treatment, transportation, and disposal of solid and hazardous wastes;

     (h)    failure to reasonably conform and abide by the permits issued by the Commonwealth of Pennsylvania, more specifically designated as Residual Waste Class II Disposal Impoundment Permit No. 301257; Dam Safety Permit No. D48-149; Water Quality Part II Permit No. 4887204; NPDES Permit No. PA0012823;

     (i)    failure to take proper and adequate measures to abate the leak in a timely fashion;

     (j)    failure to utilize due diligence in abating the leak;

     (k)    failure to take proper and adequate measures to prevent the spill from invading the Delaware River and surrounding surface areas and properties;

22

(l)   failure to timely notify Federal, State, and local officials;

(m)   failure to adequately and properly provide timely notice and warning to area residents in close proximity to the spill;

(n)   failure to timely notify municipalities in and around the area of the spill, including municipalities situated along the Delaware River;

(o)   failure to timely notify residents, businesses and recreational users of the Delaware River;

(p)   failure to properly and adequately warn area residents, river residents, Federal, State, and local officials;

(q)   failure to institute and maintain a spill/leak/catastrophe emergency plan;

(r)   failure to design, implement and maintain proper and adequate emergency measures;

(s)   failure to design and maintain emergency structures and/or devices in the event of a failure;

(t)   failure to cease coal burning operations during an emergency;

(u)   utilization of the unlined and unpermitted Basin #1 as a depository subsequent to the initial spill;

(v)   failure to adequately and properly address, correct, remediate, abate, and prevent the numerous incidents of pollution referenced via self-report from July 5, 1991 to July 22, 2004, which incidents included leakage/discharge of thousands of gallons of pollutants, including the following: various types of oil, fly ash, waste water, raw sewage, and ethylene glycol, etc.

82.   As a direct and proximate result of the Defendant's negligence, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of

deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT TWO

### GROSS NEGLIGENCE/RECKLESSNESS

83.     The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 82 above as though set forth fully herein.

84.     The catastrophic spill of at least one hundred million (100,000,000) gallons of fly ash slurry and hazardous substances directly into and around the Delaware River was directly and proximately caused solely by the gross negligence, recklessness and/or carelessness of the Defendant, their servants, agents and/or employees.

85.     The gross negligence, recklessness and/or carelessness of the Defendant, their servants, agents and/or employees, include, but are not limited to the following:

    (a)     reckless disregard for the safety and welfare of any and all individuals and
            residents situated near or around the plant;

    (b)     reckless disregard of any and all resident and recreational users below the

24

point source of the spill;

(c) reckless and grossly negligent maintenance and inspection of Basin #4 and its nitrogen structures;

(d) reckless and grossly negligent failure to maintain and implement adequate inspection and maintenance procedures and protocols for Basin #4;

(e) grossly negligent and reckless handling of storage of solid and hazardous wastes;

(f) grossly negligent actions and/or omissions in failing to take measures in order to abate the catastrophe in a timely manner;

(g) reckless and grossly negligent for failure to prevent the spill from abating the Delaware River and surrounding surface areas and properties;

(h) reckless and grossly negligent for failure to conform to and abide by Residual Waste Class II Disposal Impoundment Permit No. 301257; Dam Safety Permit No. D48-149; Water Quality Part II Permit No. 4887204; NPDES Permit No. PA0012823;

(i) reckless and grossly negligent for failure to notify federal, state, local officials, municipalities, residents, business, and recreational users of the Delaware River;

(j) reckless and grossly negligent failure to institute and maintain a spill/leak/catastrophe emergency plan;

(k) reckless and grossly negligent failure to design and maintain emergency structures and/or devices in the event of a failure;

(l) reckless and grossly negligent operation of a power generation facility;

(m) reckless and grossly negligent conduct in the generation, use, handling, storage, treatment, transportation and disposal of solid and hazardous waste;

(n) reckless and grossly negligent utilization of Basin #1;

(o) recklessly and grossly operated and continued to operate an inadequately and improperly designed Basin #4, which together with failure to effectuate reasonable and proper inspections represented an unreasonable risk of danger to the Plaintiffs and similarly situated residents in the State of New Jersey and Commonwealth of Pennsylvania.

25

86.     As a direct and proximate result of the Defendant's gross negligence/recklessness, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT THREE

## INTENTIONAL ACTS/GROSS/RECKLESS DISREGARD

87.     The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 86 above as though set forth fully herein.

88.     The Defendants, during and subsequent to the catastrophic spill, blatant disregard of the property interests, heath, safety, and welfare of the Plaintiffs and similarly situated class of

plaintiffs, continued coal-burning operations and production of additional fly ash and other hazardous substances diverting said fly ash residue to Basin #1, representing an unsafe, inappropriate, unauthorized, and unpermitted disposal site.

89.    The intentional/willful/reckless/grossly negligent actions of the Defendants were also representative of illegal conduct by diverting the newly created fly ash into an unlined, unpermitted basin, Basin #1.

90.    The Defendants knew, or reasonably should have known, that the newly created fly ash slurry pumped into the unpermitted, unauthorized Basin #1 was representative of an unreasonable continuing risk of danger in the face of the initial spill for further failure and contamination exposing the Plaintiffs to substantial risk of danger to their health, welfare, safety, and property rights.

91.    On or about September 8, 2005, Basin #1 failed, which failure resulted in further discharge of fly ash slurry and additional contamination including contamination of the ground and drinking water.

92.    The Defendant, PPL, intentionally/willfully/recklessly/gross negligently rendered said decision subsequent to the initial catastrophic spill to fail to cease coal burning operations and unreasonably exposed the Plaintiffs and similarly situated individuals to an unreasonable risk of further exposure to contamination by utilizing an unauthorized, unpermitted, and unlined basin (Basin #1) based upon the economic gain and benefit to the Defendant to the detriment of the Plaintiffs.

93.    The conduct of the Defendant is representative of willful, intentional, reckless and/or grossly negligent acts for which compensatory and punitive damages are mandated.

27

94.    As a direct and proximate result of the Defendant's intentional acts/gross/reckless disregard, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT FOUR

## TORT OF OUTRAGE

95.    Plaintiffs incorporate by reference the allegations contained of paragraphs 1 through 94 above as though set forth fully herein.

96.    The Defendants willful and intentional failure to cease coal-burning operations and, further, to subject the Plaintiffs to unreasonable risk of further harm and danger by Defendants' utilization of unpermitted, unauthorized, and unlined basin representative of the tort

28

of outrage.

97.    As a direct and proximate result of the Defendant's tort of outrage, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT FIVE

### NEGLIGENCE, PER SE

98.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 97 above as though set forth fully herein.

99.    The Defendant has egregiously violated various Federal and State statutes, together with numerous Administrative Code provisions, including but not limited to the New

Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the New Jersey Water

Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; the New Jersey Safe Drinking Water Act,

N.J.S.A. 58:12A-1 et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.;

the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq.; the Pennsylvania Clean

Streams Law, 35 P.S. §§ 691.1-691.1001; the Solid Waste Management Act, 35 P.S. §§

6018.101-6018.1003; the Air Pollution Control Act, 35 P.S. §§ 4001-4015; the Hazardous Sites

Cleanup Act, 35 P.S. §§ 6020.101-6020.1305; the Dam Safety and Encroachment Act, 32 P.S. §§

693.1-693.27.

     100.    The specific statutory code provisions are more fully set forth in the Pennsylvania

Department of Environmental Protection's Complaint in the enforcement action and are

incorporated in their entirety by reference herein.

     101.    The violation of the aforementioned statutes constitutes negligence, per se, since

plaintiffs are among the class of persons whose statutes and code provisions were designed to

protect.

     102.    As a direct and proximate result of the Defendant's statutory violations

representative of negligence, per se, the Plaintiffs have suffered and will continue to suffer

extensive damages, including but not limited to property damage; environmental contamination

including air, surface and ground water; exposure to an unreasonable risk of danger to their

health, welfare, and safety due to the exposure from air and water of toxins and harmful

substances; exacerbation of the previously imposed conditions of deleterious air quality caused

by numerous prior years of emissions from coal combustion; loss of property use; significantly

diminished property values; substantial interference with the quiet enjoyment and use of their

properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT SIX

## STRICT LIABILITY

103.   The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 102 above as though set forth fully herein.

104.   The Defendants' generation of electric power and use, storage, handling, mishandling, transportation, production, disposal of hazardous wastes and substances constitutes an abnormally dangerous and/or ultra-hazardous activities, the nature of which subjects the defendants to strict liability for all resultant harm.

105.   As a direct and proximate result of the strict liability of the Defendants, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial

31

interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT SEVEN

## NUISANCE

106.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 105 above as though set forth fully herein.

107.    The Defendants' negligence, gross negligence and/or reckless acts and omissions have directly caused the introduction of over one hundred million (100,000,000) gallons of fly ash slurry directly in and around the Delaware River.

108.    The Defendants' acts and/or omissions have caused a direct invasion and interference with the plaintiffs' property rights and use and enjoyment thereof and, further, exposed the Plaintiffs to a substantial and enhanced risk of disease and illness, affecting their health, safety, and welfare.

109.    The Defendants' acts and/or omissions have interfered and continue to interfere with the plaintiffs' rights associated with their property, including the right to utilize and enjoy their property, thereby creating a substantial nuisance.

32

110.    As a result of said nuisance, the Plaintiffs have incurred significant damages to their property and use thereof as a result of the spill, including but not limited to pollutants, solid waste, and hazardous waste deposited directly on and around the plaintiffs' real and personal properties, the significant and substantial impairment of any and all recreational activities, including boating, fishing, water activities, swimming, etc., causing plaintiffs to seek alternative drinking water sources for fear of contamination, subjecting Plaintiffs to significant and substantial disruptions with respect to post-spill activities and remediation efforts including vastly increased boat traffic, airboats, barges, divers, pipes, diesel generators, diesel pumping systems, water use, restrictions, etc.

111.    As a direct and proximate result of the nuisance caused by the Defendants, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive

damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT EIGHT

## CONTINUING NUISANCE

112.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 111 above as though set forth fully herein.

113.    The Defendants' acts and omissions averred above invaded and interfered and continue to invade and interfere with the plaintiffs' rights in its possession and control of its property.

114.    The Defendants' acts and omissions have interfered and continue to interfere with the plaintiffs' rights, including the right to use and enjoy their property.

115.    As a result of said nuisance, the Plaintiffs have incurred significant damages to their property and use thereof as a result of the spill, including but not limited to pollutants, solid waste, and hazardous waste deposited directly on and around the plaintiffs' real and personal properties, the significant and substantial impairment of any and all recreational activities, including boating, fishing, water activities, swimming, etc., causing plaintiffs to seek alternative drinking water sources for fear of contamination, subjecting Plaintiffs to significant and substantial disruptions with respect to post-spill activities and remediation efforts including vastly increased boat traffic, airboats, barges, divers, pipes, diesel generators, diesel pumping systems, water use, restrictions, etc.

116.    As a direct and proximate result of the continuing nuisance created by the Defendant, the Plaintiffs have suffered and will continue to suffer extensive damages, including

but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT NINE

## PUBLIC NUISANCE

117.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 116 above as though set forth fully herein.

118.    The negligent, grossly negligent, reckless and careless conduct of the Defendants averred above has created a public nuisance in and around the Delaware River from the point source of the spill to approximately forty (40) miles south of the point source because the conduct of the defendants substantially interfered with the public rights, including but not limited to clean water of the river, clean drinking water, recreational use of the river, use of natural

public resources, in particular, such conduct substantially interfered with the same private rights of the Plaintiffs.

119.    Said conditions created by the defendant constitutes a public nuisance pursuant to the Laws of the Commonwealth of Pennsylvania, including but not limited to the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; the New Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-1 et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.; the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq.; the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1-691.1001; the Solid Waste Management Act, 35 P.S. §§ 6018.101-6018.1003; the Air Pollution Control Act, 35 P.S. §§ 4001-4015; the Hazardous Sites Cleanup Act, 35 P.S. §§ 6020.101-6020.1305; the Dam Safety and Encroachment Act, 32 P.S. §§ 693.1-693.27.

120.    As a direct and proximate result of the public nuisance created by the Defendant, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other

recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT TEN

### NUISANCE, PER SE

121.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 120 above as though set forth fully herein.

122.    The egregious violation of the statutes and code provisions more fully described above by the defendants constitutes a nuisance per se, since the plaintiffs are among the class of persons the statutes and code provisions were designed to protect.

123.    The Plaintiffs have suffered significant and substantial damages as a result of the defendants' nuisance per se.

124.    As a direct and proximate result of the nuisance, per se, created by the Defendant, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and

37

prospective contamination of surface, ground water and wells; the loss of recreational

opportunities associated with their properties, including swimming, boating, fishing, and all other

recreational activities associated with the river; together with damages to personal property and

other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive

damages, together with costs of litigation, including but not limited to attorneys fees, expert fees

and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT ELEVEN

### TRESPASS

125.   The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 124

above as though set forth fully herein.

126.   The Defendants have negligently, recklessly, and/or intentionally directly caused

the release of over one hundred million (100,000,000) gallons of fly ash-laden contaminants

directly into and around the Delaware River, including any and all property owners adjoining the

Delaware River, up to and including approximately forty (40) miles below the point source of the

spill.

127.   The negligent, reckless, and/or intentional acts and omissions of the Defendant

have directly and proximately caused a direct and substantial invasion directly into and on the

plaintiffs' real and personal property, thereby constituting a trespass.

128.   As a direct and proximate result of the trespass, the Plaintiffs have suffered and

will continue to suffer extensive damages, including but not limited to property damage;

environmental contamination including air, surface and ground water; exposure to an

unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## COUNT TWELVE

### CONTINUING TRESPASS

129.    The Plaintiffs incorporate by reference the allegations of paragraphs 1 through 128 above as though set forth fully herein.

130.    The Defendant has negligently recklessly, and/or intentionally caused the release of at least one hundred million (100,000,000) gallons of fly ash contaminated slurry directly into and around the Delaware River, which directly invaded and contaminated the Plaintiffs' properties.  The invasion is significant and continues to detrimentally affect the Plaintiffs' properties.

131.    The aforementioned actions of the Defendant have caused and continue to cause

an invasion by pollution and contamination of the plaintiffs' interests in their properties, thereby constituting a continued trespass.

132.    As a direct and proximate result of the continuing trespass, the Plaintiffs have suffered and will continue to suffer extensive damages, including but not limited to property damage; environmental contamination including air, surface and ground water; exposure to an unreasonable risk of danger to their health, welfare, and safety due to the exposure from air and water of toxins and harmful substances; exacerbation of the previously imposed conditions of deleterious air quality caused by numerous prior years of emissions from coal combustion; loss of property use; significantly diminished property values; substantial interference with the quiet enjoyment and use of their properties; nuisance; contamination and prospective contamination of surface, ground water and wells; the loss of recreational opportunities associated with their properties, including swimming, boating, fishing, and all other recreational activities associated with the river; together with damages to personal property and other associated damages and injuries.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages, punitive damages, together with costs of litigation, including but not limited to attorneys fees, expert fees and engineering fees, interest and any other relief which this court deems just and proper.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury as to all issues of the within matter.

## DESIGNATION OF TRIAL COUNSEL

Arthur J. Russo, Esquire and Jeffrey M. Russo, Esquire of Russo Law Offices, together with

James W. Broscious, Esquire, and John Zaiter, Esquire, of the firm Broscious & Fisher, are hereby

designated as trial counsel in this matter.

## CERTIFICATION

The matter in controversy is also the subject of an action brought by the Commonwealth of

Pennsylvania, titled *Commonwealth of Pennsylvania Department of Environmental Protection v.*

*PPL Generation, LLC and PPL Martins Creek, LLC, Docket No. 584 MD 2005,* for reclamation

and declaratory relief upon which certain specified plaintiffs in the within action, together with the

Delaware Riverside Conservancy Inc., a non-profit corporation, has been granted intervention by

Order of the Commonwealth Court dated February 24, 2006.

RUSSO LAW OFFICES

_____          _____
Jeffrey M. Russo, Esquire                          Arthur J. Russo, Esquire

BROSCIOUS & FISCHER, PC

_____          _____
James W. Broscious, Esquire                      John M. Zaiter, Esq.

Dated:  March 30, 2006

41